**In re Teresa G. HAMBY a/k/a Teresa G. Jones, Debtor.**

**No. 02 35808.**

United States Bankruptcy Court, E.D. Tennessee.

Jan. 17, 2007.

---

Jimmie D. Turner, Oliver Springs, TN, for Debtor.

R. Deno Cole, Knoxville, TN, for Creditor, Arvel's Used Cars.

### MEMORANDUM ON MOTION TO HOLD CREDITOR IN CONTEMPT FOR DAMAGES FOR VIOLATION OF AUTOMATIC STAY

RICHARD STAIR, JR., Bankruptcy Judge.

This contested matter is before the court upon the Motion by Debtor Teresa G. Hamby to Hold Creditor Arvels Used Cars in Civil Contempt and Liable for Damages for Violation of Automatice [sic] Stay 11 USCS [sic] § 362(A) [sic]; Bankruptcy Rule 9020 (Motion for Contempt) filed by the Debtor on October 17, 2006, asking the court to find that Arvel Sexton, d/b/a Arvel's Used Cars (Mr. Sexton), violated the automatic stay on October 7, 2006, when he would not release her car to her, and that he be held in contempt for doing so.

An evidentiary hearing on the Motion for Contempt was held on January 3, 2007. The record before the court consists of sixteen exhibits introduced into evidence, along with the testimony of four

witnesses, the Debtor, Mr. Sexton, Jeanie Sexton (Ms. Sexton), and Chris Sexton.[1] The court also takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of undisputed facts of record in the Debtor's bankruptcy case file.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A) and (O) (West 2006).

## I

The Debtor filed the Voluntary Petition commencing her Chapter 13 bankruptcy case on November 5, 2002. Mr. Sexton was listed as a secured creditor, holding a lien on the Debtor's 1998 Chevrolet Cavalier (Cavalier). The Debtor's Chapter 13 Plan confirmed on December 27, 2002, values the Cavalier at $2,000.00, and provides for monthly payments to Mr. Sexton of $43.00 plus 0% interest. *See* Ex. 12. A proof of claim dated November 14, 2002, in the amount of $4,600.00 was prepared on behalf of Arvel's Used Cars but was not filed because Mr. Sexton's wife, the person who handled the financial affairs of the business at that time, was taken ill and passed away. *See* Ex. 2; Ex. 3. Mr. Sexton has not received any payments from the Chapter 13 Trustee, nor has he received any payments on the Cavalier from the Debtor since she filed her bankruptcy case. There is no dispute, however, that Arvel's Used Cars is the lienholder on the Cavalier, as reflected by notation on the vehicle's Certificate of Title. *See* Ex. 4.

Sometime in August 2006, the Debtor was talking with Mr. Sexton about trading the Cavalier for another vehicle. The Debtor testified that Mr. Sexton told her about a 2004 Chevrolet Cavalier but it was not ready at that time, so Mr. Sexton allowed her to test-drive and take home a Dodge Durango which she kept for approximately two months; that she was

contacted by Ms. Sexton on October 7, 2006, who asked her to come to Arvel's Used Cars because someone was interested in buying her Cavalier; that when she arrived, she saw no one interested in purchasing her vehicle, and instead, Ms. Sexton stated that the Debtor hadn't made any payments on the Cavalier since she bought it; that she, the Debtor, replied that she was in bankruptcy, and Mr. Sexton should be getting paid through the bankruptcy; that when she noticed the radio being removed from her Cavalier, she told the mechanic to stop; and that Mr. Sexton told her that she had "done him dirty" and he was keeping the Cavalier. The Debtor testified that she then used the telephone at Arvel's Used Cars to call her sister to come and pick her up, but she did not wait, and instead, began walking and had walked for almost two miles by the time her sister arrived. The Cavalier was not returned to the Debtor until November 27, 2006.

Mr. Sexton testified that the facts as stated by the Debtor are incorrect, and that the events occurred as follows. The Debtor came to Arvel's Used Cars sometime in August 2006, and left the Cavalier for repairs, at which time, Mr. Sexton gave her the Durango as a "loaner" vehicle to drive while the requested repairs were being made. Once the repairs were finished, Mr. Sexton asked Ms. Sexton to prepare a bill for the repairs, which she did on October 5, 2006 (Statement). *See* Ex. 1. This Statement, for $300.00, bills the Debtor $80.00 for a right front axle and $120.00 for four hours of labor on October 4, 2006, and $40.00 for a wheel-bearing right front and $60.00 for two hours of labor for October 5, 2006. Ex. 1. Mr. Sexton then asked Ms. Sexton to call the

---

**1.** Although they share the same last name, Ms. Sexton testified that she and Mr. Sexton are not related. Mr. Sexton testified that Chris Sexton is his nephew.

Debtor on October 7, 2006, about coming to pick up the repaired Cavalier. When the Debtor came in to pick up the Cavalier, she refused to pay the $300.00 bill for repairs, stating that she did not have to pay anything because she was in bankruptcy. Mr. Sexton then advised that he would not return the Cavalier until the Debtor paid for the repairs. He testified that the Debtor voluntarily walked off the premises after she used his telephone to call someone to come and get her, despite his invitation for her to wait there. Mr. Sexton agreed to release possession of the Cavalier to the Debtor once she deposited $300.00 into her attorney's trust account to cover the repairs, which occurred just prior to November 27, 2006. Also in support of his version of the facts, Mr. Sexton relied upon the testimony of Ms. Sexton and Chris Sexton.

## II

■ The Debtor contends that Mr. Sexton violated the automatic stay by taking possession of the Cavalier and by imposing a mechanics lien upon it while it is property of the Debtor's bankruptcy estate. The commencement of the Debtor's bankruptcy case triggered the protection of the automatic stay, set forth in § 362(a), which provides, in material part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301 ... operates as a stay, applicable to all entities, of—

.    .    .    .    .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

11 U.S.C.A. § 362(a)(3) (West 2004). The automatic stay remains in effect throughout the pendency of the bankruptcy case, and actions taken in violation thereof are "invalid and voidable and shall be voided absent limited equitable circumstances."[2] *Easley v. Pettibone Mich. Corp.,* 990 F.2d 905, 911 (6th Cir.1993).

■ Certain actions are, nevertheless, excepted from the automatic stay, including "any act to perfect, or to maintain or continue the perfection of an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b)[.]" 11 U.S.C.A. § 362(b)(3) (West 2004). Section 546(b) limits a trustee's avoidance powers under 11 U.S.C.A. § 549 (West 2004)[3] with respect to "the maintenance or continuation of perfection of an interest in property ... [i]f a law ... requires seizure of such property ... to accomplish such perfection, or maintenance or continuation of perfection of an interest in property[.]" 11 U.S.C.A. § 546(b) (West 2004). Statutory liens such as mechanics liens fall within the scope of this exception. *Durkan Patterned Carpet, Inc. v. Premier Hotel Dev. Group (In re Premier Hotel Dev. Group),* 270 B.R. 234, 241 (Bankr.E.D.Tenn.2001). Accordingly, if the court determines that Mr. Sexton held a statutory mechanics lien upon the vehicle for the repairs done, his retention of the Cavalier did not violate the automatic stay.

---

**2.** Pursuant to 11 U.S.C.A. § 1327(b) (West 2004), "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." The December 27, 2002 Order Confirming Chapter 13 Plan provides that "property of the estate does not vest in the debtor until completion of the plan." Hence, § 362(a)(3) continues to have application until the Debtor completes her plan.

**3.** Section 546(b) has application beyond § 549, but only that section, which deals with post-petition transfers, has application to the present contested matter.

Tennessee has two such statutory liens. The first is found at Tennessee Code Annotated section 66–19–101, entitled "Lien for repairs to conveyances generally," which states as follows:

> There shall be a lien upon any type of conveyance used in the transportation of persons or merchandise either by land or by water or through the air, propelled by any sort of power, for any repairs or improvements made or parts or fixtures furnished at the request of the owner, or the owner's agent, in favor of the mechanic, contractor, founder, or machinist who makes on any such vehicle mentioned any repairs or puts thereon any improvements, fixtures, machinery, or materials; provided, the lien shall not extend to, nor shall the provisions of this section and § 66–19–102 be construed as in any way affecting the right and title acquired by a purchaser without notice.

TENN. CODE ANN. § 66–19–101.[4] The second statute is Tennessee Code Annotated section 66–1–103 entitled "Garagekeeper's or towing firm's lien," which provides, in material part, as follows:

> (a) (1)(A) Garagekeepers or establishments substantially in the business of towing vehicles for hire, pursuant to the provisions of title 55, chapter 16, hereinafter referred to as "towing firms" shall be entitled to a lien upon all vehicles, which lawfully come into their possession and are retained in their possession until all reasonable charges due are paid. A garagekeeper may, after thirty (30) days, enforce this lien in the manner prescribed for the enforcement of artisans' liens under §§ 66–14–102—66–14–

106, except the garagekeeper shall only be required to advertise the sale one (1) time in a newspaper published in the place where the sale is to be held.

> .     .     .     .     .

> (b) For purposes of this section, "garagekeeper" means any operator of a parking place or establishment, motor vehicle storage facility, or establishment for the servicing, repair or maintenance of vehicles.

TENN. CODE ANN. § 66–19–103.

The two statutory liens provide protection for persons who work on vehicles, but the conditions precedent in the statutes are different. . . . The lien in Tenn. Code Ann. § 66–19–101—called the "statutory" lien—remains on the vehicle whether the repairman retains possession or not. *Gem Motor Co. v. Sec. Inv. Co.*, 16 Tenn.App. 608, 65 S.W.2d 590 (1933). But it requires that the work be done "at the request of the owner, or the owner's agent." We think that means that the owner or the owner's agent must request the work from the person asserting the lien.

The so-called "common law lien" described in Tenn.Code Ann. § 66–19–103, exists only so long as the garagekeeper retains possession. *Forrest Cate Ford, Inc. v. Fryar*, 62 Tenn.App. 572, 465 S.W.2d 882 (Tenn.App.1970). By its terms it does not require that the work be done at the request of the owner or the owner's agent.

*Simpson v. Bicentennial Volunteers, Inc.*, No. 01–A–01–9809–CV–00493, 1999 WL

---

4. Duration of lien.
   The lien shall be upon and include the conveyance and improvements thereon, and continue for twelve (12) months after the work is finished or repairs made or material furnished and until the final decision of any suit that may be brought within that time for the debt to the contractor, or undertaker, or furnisher, and bind the conveyance and improvements thereon; provided, that the conveyance with improvements thereon has not been transferred in good faith to a purchaser without notice. TENN. CODE ANN. § 66–19–102.

430497, *3, 1999 Tenn.App. LEXIS 414, at *6–7 (Tenn.Ct.App. June 29, 1999).

There is a dispute between the Debtor and Mr. Sexton as to whether the Debtor requested that Arvel's Used Cars make repairs to her Cavalier. The Debtor testified that she did not leave the Cavalier with Mr. Sexton for him to make repairs, that she only intended to leave it while she test-drove the Durango, and that she did not even know Mr. Sexton did repairs. She testified, however, that Mr. Sexton told her that the Cavalier needed a front axle and that she should just keep driving the Durango, which she did until the end of September, when she began driving a 2004 Cavalier of Mr. Sexton's, after she complained that gas for the Durango was too expensive.

Conversely, Mr. Sexton testified that the Debtor requested the repairs, that he used parts from another car that he had on his lot, and that he allowed her to continue driving the Durango while the repairs were being made. His testimony was supported by that of Ms. Sexton, who testified that on October 5, 2006, he asked her to prepare the Statement and that he asked her to call the Debtor about her car being ready, both of which she did. Ms. Sexton also testified that after handing the Statement to the Debtor, she, the Debtor, handed it back, stating that she was in bankruptcy and did not have to pay. Ms. Sexton also testified that Mr. Sexton advised the Debtor then that she could not take the car without paying for the repairs.

Based upon the evidence as a whole, the court finds that Mr. Sexton made repairs to the Cavalier either at the request of the Debtor, or at least with her knowledge and acquiescence. The Debtor testified that Mr. Sexton advised her that the Cavalier needed a front axle while she was driving the Durango. Furthermore, she testified

that she drove the Durango for approximately two months before then driving the 2004 Cavalier. It seems unlikely that a car dealer would allow a customer to "test-drive" a vehicle for such an extended period of time without having some sort of payment arrangement in place. Furthermore, irrespective of whether the Debtor actually requested the repairs, the court is satisfied that Mr. Sexton, in fact, made the repairs itemized on the Statement. Accordingly, as long as the Debtor refused to pay for the repairs, Mr. Sexton was authorized, by either Tennessee Code Annotated sections 66–19–101 or 66–19–103, to retain possession of the Cavalier until the repairs were paid for, and his actions on October 7, 2006, in doing so did not violate the automatic stay of § 362(b)(3).

For the reasons set forth herein, an order will be entered denying the Debtor's Motion for Contempt.

An order consistent with this Memorandum will be entered.