In re Hulon L. CRISP, Debtor.

No. 08–12141.

United States Bankruptcy Court,
W.D. Tennessee,
Eastern Division.

June 17, 2010.

832

Michael T. Tabor, Jackson, TN, for Debtor.

## MEMORANDUM OPINION RE: DEBTOR'S MOTION TO CEASE DISBURSEMENTS TO D.F.W.K., LLC

G. HARVEY BOSWELL, Bankruptcy Judge.

The Court conducted a hearing on the debtor's motion to cease disbursements to D.F.W.K., LLC, on April 8, 2010. Fed. R. Bankr.P. 9014. On the request of counsel, the Court left the record open an additional 15 days for the filing of agreed documents or briefs. The parties did not file any additional documents or briefs.

The Court has reviewed the testimony from the hearing and the record as a whole. This memorandum opinion shall serve as the Court's findings of facts and conclusions of law. Fed. R. Bankr.P. 7052.

## I. FACTS

The debtor in this case, Hulon L. Crisp, ("Crisp"), filed a chapter 13 petition for bankruptcy relief on June 17, 2008. Crisp listed Dealer Finance of Western Kentucky, LLC, ("Dealer Finance"), on schedule D of his petition with a claim of $12,000.00 which was secured by a 2002 Chevy Trailblazer, ("Chevy"). Crisp purchased the Chevy on August 2, 2007. His wife, Mary Crisp, is a co-obligor on the note.

Crisp's chapter 13 plan proposed to pay Dealer Finance's $12,000.00 claim with 8% interest at the rate of $246.00 per month. Pursuant to a pre-confirmation modification, the debtor increased the value of Dealer Finance's claim to $12,227.80 with 10% interest to be paid at the rate of $350.00 per month. Crisp's plan was confirmed on September 16, 2008.[1]

On November 4, 2008, Crisp filed a motion to suspend his plan payments for 90 days because he needed to make repairs to "a certain vehicle." Although the motion did not identify which vehicle needed repairs, Crisp testified at the hearing in this matter that the vehicle being referred to was the Chevy. The Court entered an order granting Crisp's motion on January 23, 2009, but only for a period of 30 days.

---

1. The plan that was confirmed on September 16, 2008, listed the value of Dealer Finance's claim as $11,750.00. It was not until an administrative order allowing claims was entered on November 14, 2008, that Dealer Finance's claim was increased from $11,750.00 to $12,227.80.

Crisp testified that he initially intended to do the repairs himself; however, in February or March 2009, he determined that he would not be able to do so. At that time, Crisp took the Chevy to Whiteville Transmission Company, ("Whiteville Transmission"), in Whiteville, Tennessee. Crisp testified that Whiteville Transmission inspected the Chevy and determined that it needed a new engine. Crisp testified that he did not, at any time during this case, receive a written estimate of what the new motor would cost.

Nearly six months after Whiteville Transmission informed Crisp that the vehicle needed a new engine, Crisp filed a second motion to suspend his plan payments. Pursuant to that motion, Crisp needed a 45–day suspension in order to pay for the new motor for the Chevy. The Court granted that motion on October 26, 2009.

On February 17, 2010, Crisp filed a motion to cease payments to Dealer Finance. Crisp alleged that over the past year he had been attempting to collect the money for the Chevy's new engine; however, "during the week of February 8, 2010 Mr. Crisp saw his vehicle being driven by another party and went to Whiteville Transmission to determine why someone else was driving his vehicle." Lisa Taylor, whose husband allegedly owns Whiteville Transmission, informed Crisp that the vehicle had been put up for sale and she had purchased it from McDaniels Auto Repair and Towing, ("McDaniels"), in Atoka, Tennessee, on September 15, 2009.[2] In light of this sale, Crisp asked the Court to cease disbursements to Dealer Finance, reclassify Dealer Finance's remaining claim as unsecured, delete insurance on the Chevy and to modify the chapter 13 plan payments accordingly.

The exhibits presented to the Court at the hearing in this matter show that Lisa Taylor is the owner of the Chevy. Collective Exhibit 1 consists of (1) the certificate of title for the Chevy showing Lisa Taylor is the registered owner of the vehicle; (2) a "Certification of Sales Under Special Conditions," showing that McDaniels acquired a Garage Keepers Lien on the Chevy sometime prior to September 15, 2009; (3) a Vehicle Information Request submitted to the Tennessee Department of Safety by McDaniels; (4) two newspaper notices from Covington, Tennessee, that gave notice that McDaniels was selling the Chevy by public auction on September 15, 2009; and (5) an estimate ticket from McDaniels showing that the Chevy needed a new motor. The estimate also states that there was a charge of $30 per day for storage of the vehicle for 90 days for a

---

2. There appears to be confusion as to where the Chevy was at different times during this case. Crisp testified at the hearing in this matter that he did not understand how McDaniels acquired possession of the Chevy because he took the car to Whiteville Transmission for the repairs. Crisp also testified that Whiteville Transmission's owner was the one who informed him that the Chevy needed a new motor. At the hearing in this matter, the attorney for Dealer Finance stipulated to the fact that a representative from Dealer Finance went to Whiteville Transmission in September 2009 to inspect the vehicle. Despite the parties' statements that the Chevy was at Whiteville Transmission, all portions of collective exhibit 1 indicate that McDaniels had possession of the vehicle at some point.

Although the record is unclear as to how McDaniels acquired possession of the Chevy, the Court finds it unnecessary to resolve this issue for purposes of this decision. Any issues Crisp has with McDaniels's possession of the vehicle should be addressed in state court. The only issue relevant to this decision is that a repair shop acquired a garagekeeper's lien on the Chevy in late summer or early fall 2009. Because of the lack of clarity in the record, the Court will use "repair shop" when referring to the location of the vehicle unless a more specific reference is appropriate.

total charge of $2,772.43. The estimate is dated April 12, 2009. Crisp admitted at the hearing that he was informed of the garage storage fees, but had asked the repair shop to give him additional time to get the money for the repairs. The parties also submitted photos of the Chevy as an exhibit at the hearing. These photos demonstrate that the Chevy was in a poor condition and that the repair shop had removed the engine and placed it in the trunk.

At the hearing, the parties stipulated to the fact that someone from the repair shop contacted Dealer Finance in late August 2009 to let them know that the Chevy had been left at the repair shop. A representative from Dealer Finance went to the repair shop and inspected the vehicle. Based on the condition of the Chevy and the costs of the necessary repairs, Dealer Finance made the decision to not redeem the vehicle from the repair shop. The parties also stipulated to the fact that the Dealer Finance representative informed the repair shop that Crisp was in an active chapter 13 case; however, no one from Dealer Finance or the repair shop was here to corroborate that statement. Neither Whiteville Transmission nor McDaniels have participated in Crisp's case in any way. Crisp did not list them as creditors on his petition.

Neither Dealer Finance nor the repair shop sought relief from the stay prior to selling the vehicle to Lisa Taylor. At the hearing in this matter, Crisp alleged that he did not have notice of the sale. McDaniels advertised the sale in the newspaper on two different dates, but Crisp does not live in the county in which the notices were published.

According to the chapter 13 trustee, Crisp has paid $2,921.36 in principal to Dealers Finance during the course of his case. Crisp still owes $9,306.44 in principal. The last payment to Dealers Finance, as of the date of the hearing, was in March 2010 in the amount of $350.00. Crisp is in arrears $1,875.00. On January 4, 2010, the Court set the percentage for unsecured creditors at 100%. In light of McDaniels's foreclosure on the Chevy, the Court issued an order on April 14, 2010, ceasing insurance payments on the Chevy. The Court took the issue of whether the debtor is entitled to cease payments to Dealers Finance and reclassify the remaining balance as an unsecured debt under advisement.

## II. DISCUSSION

In this case, the main issue before the Court is whether the Sixth Circuit case of *Chrysler Fin. Corp. v. Nolan (In re Nolan)*, 232 F.3d 528 (6th Cir.2000) prohibits a debtor from reclassifying a claim from secured to unsecured when a third-party acquires a postpetition statutory lien and sells the collateral in order to satisfy said lien. Implicit in this inquiry is the issue of whether the actions by McDaniels violated the automatic stay and, if so, does that violation impact Crisp's ability to modify the confirmed plan.

By virtue of 11 U.S.C. § 541, the filing of a bankruptcy petition creates a bankruptcy estate. Section 541 of the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In the Western District of Tennessee, property remains "property of the estate" until the case is discharged, dismissed, or the court otherwise orders.[3]

---

**3.** 11 U.S.C. § 1327 states "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan

vests all of the property of the estate in the debtor." In this District, the chapter 13 confirmation orders provide that "all property

■ In addition to creating an estate, filing a bankruptcy petition also triggers the protections of the automatic stay under 11 U.S.C. § 362(a). Section 362(a) prohibits creditors from attempting to collect most debts from the debtor or property of the estate. Section 362(a)(4) specifically prohibits parties from taking "any act to create, perfect or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). The stay of an act against property of the estate continues until the property is no longer property of the estate. 11 U.S.C. § 362(c)(1). The stay of any other act continues until the case is closed, dismissed, or discharged, whichever is earliest. 11 U.S.C. § 362(c). Actions taken in violation of the automatic stay are "invalid and voidable and shall be voided absent limited equitable circumstances." *Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 911 (6th Cir.1993).

■ Although § 362's automatic stay is broad, there are certain exceptions to its reach. The filing of a bankruptcy petition "does not operate as a stay . . . of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b). . . ." 11 U.S.C. § 362(b)(3). Section 546(b) provides that a trustee's avoidance powers

(b)(1) . . . are subject to any generally applicable law that—

. . .

(B) provides for the maintenance or continuation of perfection of an interest in property. . . .

(2) If—

shall remain property of the Chapter 13 estate under §§ 541(a) and 1306(a) and shall revest in the debtor(s) only upon discharge pursuant

(A) a law described in paragraph (1) requires seizure of such property or commencement of an action to accomplish such perfection or maintenance or continuation of perfection of an interest in property; and

(B) such property has not been seized or such an action has not been commenced before the date of the filing of the petition.

11 U.S.C. § 546(b). "Statutory liens such as mechanics liens" qualify under § 546(b) and are excepted from automatic stay by virtue of § 362(b)(3). *In re Hamby*, 360 B.R. 657, 660 (Bankr.E.D.Tenn.2007).

In this case, McDaniels became entitled to a garagekeeper's lien on Crisp's vehicle pursuant to T.C.A. § 66–19–103 which provides that:

Garagekeepers or establishments substantially in the business of towing vehicles for hire, pursuant to the provisions of title 55, chapter 16, hereinafter referred to as "towing firms" shall be entitled to a lien upon all vehicles, which lawfully come into their possession and are retained in their possession until all reasonable charges due are paid. A garagekeeper may, after thirty (30) days, enforce this lien in the manner prescribed for the enforcement of artisans' liens under §§ 66–14–102–66–14–106, except the garagekeeper shall only be required to advertise the sale one (1) time in a newspaper published in the place where the sale is to be held.

T.C.A. § 66–19–103(a)(1)(A). A "garagekeeper" is defined as "any operator of a parking place or establishment, motor vehicle storage facility, or establishment for the servicing, repair or maintenance of vehicles." T.C.A. § 66–19–103(b). In order to satisfy the lien, a garagekeeper may

to § 1328(a), dismissal of the case, or specific order of the Court."

sell the vehicle by auction. T.C.A. § 66–14–104.[4] Because McDaniels was enforcing its garagekeeper's lien pursuant to T.C.A. § 66–9–103 and because 11 U.S.C. § 362(b)(3) specifically excludes this type of lien enforcement from the automatic stay's reach, McDaniels's postpetition enforcement of its lien did not violate the automatic stay in this case.

Having determined that McDaniels did not violate the automatic stay, the Court now turns to the main issue of whether Crisp is permitted to modify his confirmed plan by reclassifying the balance owed to Dealers Finance as an unsecured claim. Section 1329 of the Bankruptcy Code allows a debtor to modify his plan "at any time after confirmation" but before payments are completed under the plan to

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments;

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan; or

(4) reduce amounts to be paid under the plan by the actual amount expended by the debtor to purchase health insurance . . . .

11 U.S.C. § 1329(a)(1)-(4). Prior to 2000, a debtor in the Sixth Circuit could use § 1329(a) to surrender collateral and reclassify any deficiency balance as an unsecured claim. *In re Jock,* 95 B.R. 75 (Bankr.M.D.Tenn.1989). In October 2000, the Sixth Circuit overruled the *In re Jock* rationale in the case of *Chrysler Fin. Corp. v. Nolan (In re Nolan),* 232 F.3d 528 (6th Cir.2000) and concluded that . . . a debtor cannot modify a plan under section 1329(a) by: 1) surrendering the collateral to a creditor; 2) having the creditor sell the collateral and apply the proceeds toward the claim; and 3) having any deficiency classified as an unsecured claim.

*Nolan,* 232 F.3d at 535. In reaching this decision, the court engaged in a thorough analysis of the relevant Bankruptcy Code sections and set forth five factors which prohibited reclassifying a secured creditor after the post-confirmation surrender of collateral.

First, the *Nolan* court stated that "section 1329(a) does not expressly allow the debtor to alter, reduce or reclassify a previously allowed secured claim. Instead, section 1329(a)(1) only affords the debtor a right to request alteration of the *amount or timing* of specific payments." *Id.* at 532 (emphasis added). If a debtor could reclassify a secured creditor as unsecured, it would have the effect of adding a claim to the unsecured creditors. The court stated that such an addition is prohibited by § 1329(a). *Id.*

The second factor the *Nolan* court relied on in making its decision was that § 1325(a)(5)(B) "mandates that a secured claim is fixed in amount and status and

---

**4.** T.C.A. § 66–14–102 mandates that the garagekeeper satisfy certain noticing requirements prior to auctioning a vehicle. In the case at bar, the debtor has alleged that McDaniels did not comply with these requirements. The Court finds that this issue is one which would properly be resolved in state court.

Crisp has also alleged that Dealers Finance had some duty to inform him of the garage-keeper's lien prior to its enforcement. Although T.C.A. § 66–14–102 requires the garagekeeper to give notice to the debtor and to "any other person known to the artisan who claims an interest in the goods," the Court can find nothing in the statute which imposes any responsibility on the secured creditor to give notice of the lien to the debtor. Again, if Crisp feels this is an issue, it is one which would properly be addressed in state court.

must be paid in full once it has been allowed." *Id.* at 533. "For section 1325(a)(5)(B)(ii) to provide any protection to the creditor when the debtor chooses to retain her collateral, the secured claim must not be subject to modification throughout the life of the plan." *Id.* at 533, n. 8. When a debtor attempts to "bifurcate a claim that has already been classified as fully secured into a secured claim as measured by the collateral's depreciated value and an unsecured claim as measured by any unpaid deficiency," the debtor is violating § 1325(a)(5)(B)(ii). *Id.*

Third, the *Nolan* court held that allowing debtors to surrender collateral and reclassify secured claims violated § 1327(a). *Id.* Pursuant to § 1327(a), a confirmed plan is binding on both debtors and creditors "whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.". 11 U.S.C. § 1327(a). The Sixth Circuit concluded that allowing a debtor to surrender collateral and reclassify the remaining debt as unsecured impermissibly shifted the burden of depreciation to the creditor "when the debtor no longer ha[d] any use for the devalued asset." *Nolan,* 232 F.3d at 533.

The fourth factor the *Nolan* court relied on was that allowing a debtor to reclassify a deficiency balance as an unsecured claim resulted in two inequities that the Sixth Circuit felt certain Congress did not intend. First, the *Nolan* court held that § 1329(a) does not allow a secured creditor to seek modification of a plan. Only "the debtor, the trustee, or the holder of an allowed *unsecured* claim" may seek modification under § 1329(a). 11 U.S.C. § 1329(a). "The *Jock* interpretation would create an inequitable situation where the secured creditor could not seek to reclassify its claim in the event that collateral

*appreciated,* even though the debtor could revalue or reclassify the claim whenever the collateral *depreciated." Nolan,* 232 F.3d at 534. Secondly, the *Nolan* court recognized that allowing a debtor to reclassify a deficiency balance as unsecured would allow the debtor to "evad[e] the tradeoff risks and responsibilities attending conversion or dismissal under Chapter 7." *Id.*

The fifth and final factor the *Nolan* court relied on in making its decision was that although § 1329(a) allows a debtor to increase or reduce the amount of payments to a particular class or to extend or reduce the time for such payments, it does not allow a debtor to reduce or increase the amount of a claim once the plan is confirmed. *Id.* The *Nolan* court looked to the language of the statute and concluded that "if the term 'payments' in section 1329(a) referred to the secured claim itself rather than to individual payments, the separate use of 'claims' in section 1329(a)(3) would be superfluous." *Id.* at 535.

Since its issuance, the Sixth Circuit has applied *Nolan*'s holding to a situation in which the debtor attempted to reclassify a deficiency balance following a post-petition default on payments and repossession by the secured creditor. *Ruskin v. Daimler-Chrysler Serv. North America (In re Adkins),* 425 F.3d 296, 303 (6th Cir.2005). In *Adkins,* the debtor defaulted on payments and the creditor sought relief from the automatic stay. In its motion, the creditor relied on the holding in *Nolan* and specifically requested that payment of any deficiency be allowed as a secured claim. The trustee objected and argued that *Nolan* did not apply because, unlike the factual circumstances in *Nolan,* the debtor was not attempting to voluntarily surrender the car. Instead, it was the creditor seeking relief from the stay. According to the

trustee, "[a]llowing DaimlerChrysler to affirmatively repossess the vehicle and retain secured status in the Plan ... would allow DaimlerChrysler an unfair 'double recovery' and would also be unfair to the other unsecured creditors." *Id.* at 301.

The Sixth Circuit disagreed with the trustee and held that *"Nolan's* ban against post-confirmation reclassifications equally applies to cases in which the Debtor's actions (i.e., default) have provided cause for the secured creditor to have the automatic stay lifted so the creditor may repossess the collateral." *Id.* at 302. In making its decision, the Sixth Circuit stated that the *Nolan* decision "relied heavily on the language of sections 1325 and 1327" which "mandate[ ] that a secured claim is fixed in amount and status and must be paid in full once it has been allowed" and that the terms of a confirmed plan bind the debtor and creditors. *Id.* The Sixth Circuit concluded that neither of those sections allowed a different result from the one reached in *Nolan* when the debtor defaulted as opposed to surrendering the collateral. *Id.* at 303.

In the cases of *In re Gilford,* case number 03–12717 (December 16, 2004), and *In re Graeser,* case number 04–12327 (August 29, 2006), this Court has previously found that the *Nolan* decision applied equally to cases in which a vehicle is destroyed in an accident post-confirmation. In issuing those decisions, the Court reasoned that

Although the specific holding of the Nolan court stated that a debtor could not surrender collateral and then classify the deficiency as unsecured, the statutory inquiry engaged in by the court clearly demonstrates that any proposed post-confirmation reclassification of a secured creditor's claim is prohibited by § 1329. While this Court recognizes that collateral destroyed in an accident is fundamentally different from collateral volun-

tarily surrendered, the same statutory considerations apply. Until such time as the Sixth Circuit revisits its Nolan decision, this Court holds that a debtor cannot reclassify any deficiency balance owing to a secured creditor as unsecured.

*In re Graeser,* case number 04–12327, August 29, 2006, page 3.

In the case at bar, Crisp has argued that the facts in this case are easily distinguishable from those in *Nolan, Adkins* and this Court's prior opinions because he was deprived of possession and ownership by the enforcement of the garagekeeper's lien. Crisp is correct. He did not attempt to surrender the collateral to Dealers Finance nor did he default on payments on the Chevy. The Chevy was also not destroyed in an automobile accident. Instead, Crisp voluntarily turned possession of the Chevy over to the repair shop with the intention of having the engine replaced. Crisp then allowed the Chevy to remain at the repair shop for nearly an entire year without any work being done to it. The Court must determine how these actions impact Crisp's ability to reclassify the claim.

If Crisp had kept the Chevy in his possession and sought permission to surrender it to Dealers Finance after the engine quit working and reclassify the balance as unsecured, *Nolan* would clearly prohibit such relief. Surrendering a vehicle in that condition allows a debtor to impermissibly "shift the burden of depreciation to the secured creditor ... when the debtor no longer has any use for the devalued asset." *Nolan,* 232 F.3d at 533. In the case at bar, however, Crisp testified that he never intended to surrender the Chevy to Dealers Finance. It was only after McDaniels enforced its garagekeeper's lien and Crisp was deprived of his interest in the Chevy that he filed the motion seeking to reclassi-

fy the claim. Although this is indeed a different factual scenario, the Court holds that the holdings in *Nolan*, 232 F.3d 528, and *Adkins*, 425 F.3d 296, apply equally to the case at bar.

Crisp filed his chapter 13 plan on June 17, 2008. He proposed keeping the Chevy and paying Dealers Finance as a secured creditor in the plan. The Court confirmed Crisp's chapter 13 petition on September 16, 2008. Pursuant to 11 U.S.C. § 1327(a), the provisions of that plan bound Crisp and Dealers Finance. Shortly thereafter, on November 4, 2008, Crisp filed his first motion for a plan payment suspension in which he alleged the Chevy was in need of repair. The Court granted that motion on January 23, 2009. Crisp took the Chevy to the repair shop in February or March 2009 and discovered that it would need a new engine. He testified that he did not have the money to pay for the engine at the time. On September 22, 2009, he filed a second motion to suspend plan payments for the stated purpose of paying for the repairs. Crisp then allowed the vehicle to remain at the repair shop for another five months without ever making any payments towards the cost of the new engine. During the year the Chevy sat at the repair shop, Crisp testified that he knew that storage fees were accruing. He made no payments towards these fees nor did he employ the simplest solution to their imposition: transporting the Chevy from the repair shop to his home until such time as he could gather the money for the engine.

Throughout the entire pendency of his case, Crisp has continued to make monthly payments to Dealers Finance for the Chevy. He continued the payments even when the Chevy sat at the repair shop for an entire year. The Chevy was in need of repairs as early as November 2008 and was *not* driveable from at least February or March 2009. The Court understands that the Chevy was inoperable while at the repair shop, but a car in need of a new engine would have been inoperable whether it was at a repair shop or not. Had Crisp not taken the Chevy to the repair shop, it would have been sitting in his driveway gathering dust and he would have had to continue paying Dealers Finance as a secured creditor.

The Court sympathizes with Crisp, but, after reviewing the facts in this case, simply cannot see how the facts in this case dictate any different result than the ones reached in *Nolan* or *Adkins*. Crisp is responsible for his situation. He has a vehicle that depreciated to the point of being undriveable. Instead of proposing to surrender the Chevy to Dealers Finance or voluntarily defaulting on the monthly payment to Dealers Finance, Crisp chose to have the Chevy repaired. Unfortunately, Crisp was unable to afford to do so. He voluntarily took the Chevy to the repair shop and left it there for a year. He made no arrangements to pay the incurred storage fees even after being informed of their imposition. McDaniels then enforced its lien, which it was statutorily allowed to do. It was his behavior and his alone that ultimately subjected the Chevy to the imposition of the garagekeeper's lien. In *Adkins*, the court specifically held that "Nolan's ban against post-confirmation reclassifications equally applies to cases in which the *Debtor's actions* (i.e., default) have provided cause for the secured creditor to have the automatic stay lifted so the creditor may repossess the collateral." Id. at 302 (emphasis added). Although it is the debtor seeking relief in the case at bar, as opposed to a creditor filing a motion for relief, the Court can see no reason why *Adkins* does not apply to cases in which the debtor's actions have resulted in a loss of the collateral.

The Court recognizes that this an unfortunate outcome, but allowing Crisp to reclassify Dealers Finance's remaining claim as an unsecured one would impermissibly allow him to shift the burden of depreciation to the creditor. Such relief would also allow him to reclassify the claim based on a situation for which he alone is responsible. Neither *Nolan* nor *Adkins* allow such an outcome. The Court will enter an order denying Crisp's Motion to Cease Disbursements to Dealers Finance.

**The following is SO ORDERED.**